# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 10-CV-0278 (JFB)

———————————

ELIZABETH C. STOKES,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

———————————

**MEMORANDUM AND ORDER**

March 29, 2012

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Elizabeth C. Stokes ("plaintiff" or "Stokes") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the defendant, Commissioner of the Social Security Administration (hereinafter "Commissioner"), denying plaintiff's application for Disability Insurance Benefits. The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes defendant's motion and cross-moves for judgment on the pleadings, alleging that (1) the Administrative Law Judge ("ALJ") committed reversible error in failing to obtain the advice of a medical expert to assist in determining plaintiff's disability onset date, (2) the ALJ failed to set forth the requisite "good cause" for rejecting a treating physician's opinion, (3) the ALJ failed to properly discuss 20 C.F.R. § 404.1529 factors, and (4) the ALJ did not meet the burden of showing that there was other work in the national economy that plaintiff could perform. In the alternative, plaintiff asks this Court to remand pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the cross-motions for judgment on the pleadings are denied, plaintiff's request for remand is granted, and the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

## I. BACKGROUND

### A. Facts

Plaintiff alleges that she was disabled from April 2, 1992 through December 31, 1997 as a result of medical conditions including a right knee injury, right knee pain, right knee surgery failures and complications, and Multiple Sclerosis ("MS"). (Administrative Record ("AR") 107-08, 118.) The following summary of facts is based upon the administrative record as developed by the ALJ to assess plaintiff's physical state. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

### 1. Vocational and Other Evidence

Plaintiff was born on October 14, 1962. (AR 43.) Plaintiff graduated high school and completed three years of college. (*Id*. 77, 374-75.) She then went to the New York Police Department Academy. (*Id*. 78, 375.) Plaintiff worked as a police officer on patrol for the New York City Transit Authority from 1986 through April 2, 1992. (*Id*. 375.) Her job duties entailed patrolling trains and train stations in New York City. (*Id*. 72, 375.) Plaintiff listed in her Social Security Disability Report Form that this position required her to walk for eight hours, stand for eight hours, sit for one hour, climb for six hours, stoop for one hour, kneel for one hour, crouch for four hours, reach for eight hours, and write, type or handle small objects for six hours per day. (*Id*. 73.) She also carried her equipment (night stick, gun, and flashlight), and lifted ten pounds. (*Id*.) Plaintiff testified she was injured after a work-related injury where she slipped and fell on an oil spot on December 15, 1989 and injured her knee. (*Id*. 375-76.) After her injury, plaintiff engaged in desk work for the police department until April 2, 1992. (*Id*. 19.)

Plaintiff did not work from April 2, 1992 to February 22, 1999. From February 22, 1999 to August 18, 1999, plaintiff worked as an Assistant Equipment Manager at C.W. Post for four hours a day, five days a week. (*Id*. 72, 375.)

### 2. Medical Evidence

#### a. Dr. Varriale

Plaintiff's treating physician, Dr. P. Leo Varriale, M.D., F.A.A.O.S., A.B.O.S., is an orthopedic surgeon. (*Id*. 148.) Dr. Varriale performed arthroscopic surgery on plaintiff's right knee on July 22, 1991 during which he reported chondromalacia of plaintiff's medial patella, hypertrophic synovium, chondral defect of the lateral femoral condyle, and a loose body in plaintiff's right knee. (*Id*.) Dr. Varriale reported no complications from the surgery. (*Id*.)

On February 9, 1994, Plaintiff was admitted to Mercy Medical Center, and Dr. Varriale noted that she had a fever, sinus pressure, was coughing, was feeling lightheaded, and had issues with urination. (*Id*. 145.) On February 15, 1994, plaintiff, after experiencing pain and weakness in her right knee, underwent elective tibial tubercle transfer for her right knee. (*Id*. 143-44) A cortical screw was attached to plaintiff's tibia during the surgery, after which Dr. Varriale reported no complications. (*Id*.)

On May 20, 2003, plaintiff visited Dr. Varriale regarding pain in her right knee at the request of another doctor who treated plaintiff, Dr. Jackie Orfanos. (*Id*. 305.) On examination, Dr. Varriale revealed crepitus with range of motion of the knee and x-rays revealed osteoarthritis of the patella. (*Id*.)

Dr. Varriale's impression was of patellofemoral arthritis and he prescribed physical therapy, strengthening exercises, and Advil as needed. (*Id.*) Dr. Varriale explained that plaintiff should return to him as needed. (*Id.*)

On September 19, 2006, Dr. Varriale wrote a letter opining that plaintiff has had problems with her right knee since 1989 and opined that significant arthritis of her knee disabled her from working. (*Id.* 142.) Dr. Varriale's letter stated:

> Elizabeth Stokes is a 43-year-old woman who has had problems with her right knee since 1989. Her problems necessitated arthroscopic surgery in 1991 and reconstructive patella surgery in 1994.
>
> Since the time of her surgery, she has continued to have significant problems with her knee. She has crepitus with range of motion and weakness of the quad muscles with frequent giving way.
>
> X-rays of the knee reveal severe osteoarthritis of the patellofemoral joint.
>
> It is my opinion that Ms. Stokes has significant arthritis of the knee and is disabled from working.

(*Id.*)

b. Dr. Shalini Patcha

On May 10, 1995, Dr. Shalini Patcha, a neurologist with the Queens Long Island Medical Group, examined plaintiff to evaluate a one-month long period of paresthesias, numbness in her upper and lower extremities, as well as dizziness which was "on and off" for one or two months. (*Id.*

350.) Plaintiff also reported she was "unable to perform activities like before and does not feel she has the same strength as before." (*Id.*) Dr. Patcha found no weakness, rating 5/5 motor power, and found no sensory loss. (*Id.*) Dr. Patcha noted that heal, toe and tandem walking were difficult due to plaintiff's right knee injury, but +2 deep tendon reflexes except for plaintiff's right knee which was 0 as well as slight dysmetria on the finger to nose. (*Id.*) Dr. Patcha's initial impression was to rule out demyelinating disease, but she advised plaintiff to have an MRI done. (*Id.*)

On May 24, 1995, after evaluating the MRI scan, Dr. Patcha noted acute and chronic lesions and found signals consistent with the demyelinating process. (*Id.* 351) Dr. Patcha explained that "the patient has, besides the paresthesia, no definite objective problems." (*Id.*) Dr. Patcha could not rule out demyelinating disease and noted she would re-evaluate plaintiff again in two to three months. (*Id.*)

On June 8, 1995, Dr. Patcha saw plaintiff again and while patient indicated she is "feeling slightly more tired during the summer months and has slight difficulty using her hands," Dr. Patcha found no definite weakness and brisk reflexes. (*Id.* 352) Dr. Patcha ordered visual evoked/brain stem auditory response testing, and discussed the possibility of a spinal tap, but plaintiff was reluctant to undergo the spinal tap. (*Id.*)

On July 27, 1995, Dr. Patcha saw plaintiff again and once again reported an impression of possible demyelinating disease. (*Id.* 353.) Plaintiff showed delayed response in the brain stem and medication was prescribed. (*Id.*) Dr. Patcha noted that plaintiff had "occasional paresthesia of both upper extremities but no other problems." (*Id.*)

3

On November 1, 1995, Dr. Patcha saw plaintiff for "possible acute exacerbation of MS." (*Id*. 354.) A repeat MRI showed "small demyelinating lesions but not as large as the first ones that she did in April." (*Id*.) Plaintiff did not want to start Prednisone and was "slightly feeling better since last visit with physical therapy." (*Id*.) Dr. Patcha's impression was possible MS with acute exacerbation, and she advised continued physical therapy. (*Id*.)

On December 21, 1995, Dr. Patcha explained that plaintiff's MRI tested positive for MS. (*Id*. 355.) Plaintiff was doing "fairly well except for recently when she went to Florida, [when] she developed increasing weakness and loss of balance." (*Id*.) Dr. Patcha noted that plaintiff "worked out with physical therapy and swimming. She did fairly well." (*Id.*) Plaintiff was continuing to improve and was "[e]ssentially unchanged from last examination." (*Id*.)

On January 31, 1996, Dr. Patcha explained that plaintiff was essentially unchanged and did not want to try medications. (*Id*. 356.) Dr. Patcha noted that plaintiff's symptoms had improved, but she still has the same paresthesias. (*Id.*)

On June 5, 1996, plaintiff visited Dr. Patcha and stated she was symptomatic with increasing weakness and loss of balance. (*Id*. 357.) Dr. Patcha noted that plaintiff had tried physical therapy and swimming and felt "much better." (*Id.*) Dr. Patcha wrote that plaintiff's symptoms were essentially unchanged. (*Id*.) Dr. Patcha explained that plaintiff had asked about medications, but was unwilling to start on medication at that time. (*Id*.)

On November 13, 1996, plaintiff visited Dr. Patcha and it was Dr. Patcha's impression that the MS was clinically unchanged with slight increase in symptoms. (*Id*. 358.) Plaintiff had no clear weakness except for lower extremities which were difficult to assess because of right knee problems. (*Id*.) Plaintiff exhibited "[m]arked dysmetria" and had difficulty with heel, toe, and tandem walking. (*Id.*) Plaintiff was unwilling to start medication and Dr. Patcha recommended a re-evaluation in six months. (*Id*.)

On April 30, 1997, plaintiff visited Dr. Patcha who diagnosed her with "multiple sclerosis, stable, chronic/progressive type" and stated that plaintiff's MS was clinically stable. (*Id*. 359.) Plaintiff's gait had significantly improved and she had been doing well aside from a cold. (*Id*.) Dr. Patcha instructed plaintiff to follow-up every six months. (*Id*.)

On September 12, 2003, Dr. Patcha performed a neurological examination of plaintiff. (*Id*. 96-97, 301-302.) Dr. Patcha explained that plaintiff had not sought a follow-up until recently. (*Id*.) Plaintiff reported problems with her bladder, as well as occasional blurred vision. (*Id*. 96.) On examination, plaintiff's power was 5/5 except for the right lower extremity, which exhibited spasticity and mild weakness. (*Id.* 97.) Dr. Patcha also reported that plaintiff had a spastic hemiparetic gait on the right side. (*Id*.) Dr. Patcha's impression was of chronic MS with urinary incontinence. (*Id*.) Dr. Patch ordered a follow-up MRI as well as Detrol XL for urinary incontinence. (*Id.*) Plaintiff was to return for re-evaluation in one month. (*Id*.) The MRI was performed on November 24, 2003 at the Nassau Radiologic Group, P.C. (*Id*. 95.) William J. Wortman, M.D., explained that the MRI was consistent with demyelination, but that there was "no abnormal enhancement to indicate active disease at this time." (*Id*.)

4

On December 12, 2003, Dr. Patcha saw plaintiff for the follow-up evaluation. (*Id.* 93.) Plaintiff reported falling and a minor injury to her shoulder, and that gait difficulties and weakness persisted. (*Id.*) Dr. Patcha noted no significant changes from the previous visit, and also noted that the MRI showed an increase in white matter disease, but showed no enhancement suggestive of acute active disease. (*Id.*) Dr. Patcha recommended steroid therapy, but plaintiff was not willing to undergo such therapy. (*Id.*) Plaintiff was recommended to have a follow-up evaluation in one month and have another MRI in six months. (*Id.*)

### c. Dr. Fawzy W. Salama

On February 25, 1998, Dr. Fawzy W. Salama, M.D., a neurologist with the Queens Long Island Medical Group, performed a neurological examination of plaintiff. (*Id.* 323-28.) Plaintiff relayed to Dr. Salama that she had her first attack in 1993 when she was diagnosed with having optic neuritis, but had a negative MRI at that time. (*Id.* 323.) Dr. Salama explained that, from physical examination, plaintiff appeared in no apparent distress. (*Id.*) Plaintiff's right leg numbness and weakness had resolved. (*Id.*) Dr. Salama noted that plaintiff was stable and complained of difficulty "starting violin." (*Id.*) On motor examination, Dr. Salama found mild functional weakness of right ankle dorsi flexor and mild incoordination of finger-to-finger and finger-to-nose testing, with right worse than left. (*Id.* 324.) Plaintiff's strength rated 5/5 in both her upper and lower extremities. (*Id.*) Dr. Salama's impression was of clinical evidence diagnostic of MS of stable course representing remitting/relapsing MS. Dr. Salama prescribed intravenous Solumedrol and advised plaintiff to return for a follow-up in four months. (*Id.* 325.)

### d. Dr. S. Grauer

On September 29, 1998, plaintiff was cleared for gall bladder surgery by Dr. S. Grauer, M.D. with the North Shore University Hospital. (*Id.* 330, 335.) This surgery was the result of several months of right upper quadrant pain and fatty food intolerance. (*Id.* 334-36.) Plaintiff was discharged from the hospital on October 7, 1998. (*Id.* 334.) In a post-operative visit on September 17, 1999, Dr. Greenberg noted that plaintiff's joints were swollen and painful. (*Id.* 338.)

### e. Dr. Jackie Orfanos

On June 24, 2004, plaintiff had a physical examination at the Mercy Medical center for a volunteer position. (*Id.* 317-22.) Plaintiff listed that she was taking no medications, was in good health, and did not have any physical or mental conditions which would limit her ability to perform the position for which she was applying. (*Id.* 321-22) On examination, Dr. Orfanos reported normal findings in all categories and found plaintiff physically and medically able to perform the duties for which she was applying. (*Id.*)

On August 13, 2007, Dr. Joseph Carfi examined plaintiff on referral from Dr. Orfanos. (*Id.* 221.) Dr. Carfi observed that Ms. Stokes walked on two canes and was having difficulty with her left foot, which scuffed along the floor and inverted slightly in the swing phase. (*Id.* 222.)

On January 31, 2007, Dr. Orfanos explained that plaintiff had "gained a lot of weight over the past two years. Her knees are still hurting her. She has severe arthritis." (*Id.* 230.) The starting and ending dates of treatment by Dr. Orfanos are unclear. (*See id.* 217-360.) During these visits and through multiple tests, Dr.

Orfanos and specialists documented urinary incontinence, chronic knee pain, and abnormal blood diagnostics. (*Id*. 189-90, 194, 202-03, 235, 238, 240, 251-54, 259.)

### f. Dr. Malcolm H. Gottesman

On July 27, 2004, on referral from Dr. Orfanos, plaintiff had a neurological evaluation with Dr. Malcolm H. Gottesman, M.D. at the Multiple Sclerosis Treatment Center. (*Id*. 132-33.) Plaintiff reported that she had not had an exacerbation in a long period of time and that she felt that she was essentially stable. (*Id*.) Plaintiff's main complaints stemmed from her right knee, which would give out after prolonged exertion. (*Id.* 132.) Dr. Gottesman explained that plaintiff's left eye had atrophy and pupillary defect. Dr. Gottesman rated plaintiff's muscle strength at 4/5, and explained that sensory examination was normal. (*Id*. 133.) Plaintiff also had difficulty walking. (*Id*.) Dr. Gottesman diagnosed plaintiff with MS and opined that a 1995 MRI signified ongoing disease activity. (*Id*.) Dr. Gottesman ordered additional MRIs. (*Id*. 33.) Dr. Gottesman also opined that "[s]everal other reports from 1995 of intermediate quality were reviewed and seemed abnormal, but they could not be directly compared." (*Id*. 132.)

On August 16, 2004, on referral from Dr. Gottesman, plaintiff had an MRI. (*Id*. 130-31.) Dr. Joseph L. Zito, M.D. compared this MRI with the December 24, 2003 MRI, found no interval change, and saw no evidence to suggest active demyelination. (*Id*.)

On August 18, 2004, on referral from Dr. Gottesman, plaintiff had an MRI done on her cervical spine. (*Id*. 128-29.) Dr. William J. Wortman, M.D., found areas suspicious for demyelinating disease, but found no abnormal enhancement within the spinal cord. (*Id*.)

Dr. Gottesman summarized plaintiff's medical evidence regarding her MS diagnosis in a letter on September 8, 2004. (*Id*. 126.) Dr. Gottesman's reading of plaintiff's 1993 MRIs were negative for MS, but that she had optic neuritis at that time. (*Id*.) Dr. Gottesman wrote "I believe she has MS possibly secondary progressive." Dr. Gottesman discussed treatment of Copaxone and Avonex with plaintiff and instructed her to call after bloodwork was completed. (*Id*.)

On January 5, 2005, plaintiff returned for a follow-up with Dr. Gottesman. (*Id*. 173.) Dr. Gottesman noted that plaintiff denied bowel or bladder problems, but continued to have problems with her gait. (*Id*.) Dr. Gottesman's impression was "[p]robably progressive MS." (*Id*.) Dr. Gottesman noted that plaintiff "report[ed] that she has not had a discrete relapse probably since the onset of MS in 1993, with left optic neuritis." (*Id.*)

Dr. Gottesman treated plaintiff from April 5, 2006 (*id*. 111-13) until at least November 2007. (*Id*. 121-125, 156.) On August 29, 2006, Dr. Gottesman explained that plaintiff had been under his care for multiple sclerosis since July 27, 2004, and that she had "increased weakness in her lower extremities and at times has difficulty lifting her right leg to walk. She ambulates with a cane and walks with a wide-based ataxic gait." (*Id*. 110.)

On May 7, 2007, Dr. Gottesman reviewed an MRI which showed no interval change regarding the appearance of the cervical spine. (*Id*. 177.) Dr. Gottesman also noted diffuse disc bulges and osseous vertebral ridges at C4-5, C5-6, and C6-7. (*Id*.)

On August 28, 2007 and February 28, 2008, Dr. Gottesman diagnosed plaintiff with "Secondary-progressive MS with relapses." (*Id*. 268, 271.)

On September 22, 2008, Dr. Gottesman filled out a residual functional capacity questionnaire for plaintiff. (*Id*. 150-55.) Dr. Gottesman wrote that he saw plaintiff four times per year for four years and more if needed. (*Id*. 150.) Dr. Gottesman's descriptions apply from when he first saw plaintiff in 2004. (*Id*. 152.) Dr. Gottesman identified fatigue, balance problems, poor coordination, weakness, unstable walking, bladder problems, bowel problems, sensitivity to heat, and pain as plaintiff's symptoms. (*Id*. 150.) Dr. Gottesman identified that plaintiff had braces on both legs and ambulates using a walker because of weakness, spasticity and dissymmetry of her lower extremities. (*Id*. 151.) Dr. Gottesman wrote that plaintiff was able to walk very limited distances without using bilateral assistive devices. (*Id*.) Dr. Gottesman wrote that plaintiff had experienced no exacerbations during the past year. (*Id*. 152.) Dr. Gottesman wrote that plaintiff was incapable of even "low stress" jobs because "even minimal stress will increase level of disability." (*Id*.) Dr. Gottesman explained that plaintiff could walk zero to twenty feet before resting and that she could only sit for one hour before needing to get up and could only stand for 5 minutes before needing to sit down or move. (*Id*. 152-53.) Dr. Gottesman wrote that plaintiff could sit and stand/walk less than two hours per day and would require a job which permits shifting positions at will. (*Id*. 153.) Dr. Gottesman wrote that plaintiff would need to take breaks every thirty minutes which could last between one and two hours and that she should raise her legs above her heart as often as possible. (*Id*.) Dr. Gottesman wrote that plaintiff could never

lift ten pounds or less, twist, stoop, crouch, climb ladders, or climb stairs. (*Id*. 154.) Dr. Gottesman also wrote that plaintiff fatigues easily with repetitive activities. (*Id*.) Dr. Gottesman also estimated that plaintiff would miss more than four days of work per month as a result of impairments or treatment. (*Id*. 155.)

g. Dr. Frank R. DiMaio

On September 8, 2004, on referral from Dr. Orfanos, plaintiff saw Dr. Frank R. DiMaio, M.D. at Winthrop Orthopaedic Associates, PC for a second opinion. (*Id*. 100-02.) Plaintiff stated she had been in pain since her knee surgery completed by Dr. Varriale and that she recently fell and sprained her right wrist. (*Id*. 100.) Plaintiff relayed that her MS was in "remission now." (*Id*.) On examination, Dr. DiMaio saw full active extension without pain. (*Id*. 101.) Dr. DiMaio reviewed x-rays from 2003 and noted severe arthritis. (*Id*.) Dr. DiMaio also suggested painful hardware as an impression. (*Id*. 102.) Dr. DiMaio suggested a reevaluation with previous x-rays and an injection test of plaintiff's right knee, and that plaintiff should consider elective hardware removal if tenderness persisted. (*Id*.)

On November 18, 2004, Dr. DiMaio performed surgery to remove the hardware from plaintiff's knee. (*Id*. 99.)

On November 24, 2004, Dr. DiMaio filled out a New York State Disability form explaining that he expected plaintiff to be disabled for approximately three months after the surgery. (*Id*. 104-05.)

h. Dr. David Zaret

On May 13, 2006, plaintiff visited Dr. David Zaret, M.D. at Orlin & Cohen Orthopedic Associates, LLP regarding a left

elbow injury. (*Id*. 278.) Dr. Zaret explained that plaintiff had a fracture, was significant for multiple sclerosis, but denied numbness or tingling. (*Id*. 278.) Dr. Zaret recommended range of motion exercises, ice packs, and anti-inflammatories as needed. (*Id.* 279.) Dr. Zaret also ordered a follow up in two weeks for a repeat x-ray. (*Id*. 279.)

### i. Dr. Joseph Carfi

On August 13, 2007, Dr. Joseph Carfi, M.D., examined plaintiff. (*Id*. 221-22.) Plaintiff had been ambulatory using one cane, but had been using two canes in the weeks prior to seeing Dr. Carfi. (*Id*. 221.) Dr. Carfi's impression was of weakness of the left lower limb and agreed that plaintiff needed a posterior leaf-spring ankle foot orthosis as well as to make physical changes to her house to make it easier to use the bathroom. (*Id*. 222.)

### 3. Administrative Proceedings

Plaintiff filed her application for disability benefits on March 24, 2006, claiming disability as of April 2, 1992. (*Id.* 15.) Plaintiff's application was denied on August 9, 2006. (*Id*.) On October 16, 2006, plaintiff requested a hearing before an ALJ. (*Id*.) A hearing was held before ALJ Jay L. Cohen ("the ALJ" or "ALJ Cohen") on February 24, 2009, where plaintiff appeared with her attorney Louis Burko. (*Id*. 15, 21.) On May 21, 2009, the ALJ issued a decision found that plaintiff was not disabled from April 2, 1992 through December 31, 1997. (*Id*. 21.) Plaintiff appealed the decision to the Appeals Council on May 24, 2009 (*id*. 10), which was denied on November 10, 2009. (*Id*. 4-7.)

### B. Procedural History

Plaintiff commenced this action on January 22, 2010, appealing the ALJ's decision that she was not disabled from April 2, 1992 through December 31, 1997. The Commissioner answered and also served the administrative record on July 26, 2010. The Commissioner filed the pending motion for judgment on the pleadings on November 1, 2010. The plaintiff's response and cross-motion for judgment on the pleadings is dated January 23, 2011, though it was not filed with the Court until April 20, 2011. The Commissioner replied on March 14, 2011. The motions are fully submitted and the Court has carefully considered the parties' arguments.

### II. STANDARD OF REVIEW

A district court may only set aside a determination by an ALJ that is "based upon legal error" or "not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotations and citations omitted)). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec*., 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an

administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

In order to obtain a remand based on additional evidence, a plaintiff must present new evidence that: "(1) is new and not merely cumulative of what is already in the record[;]" (2) is material, in that it is "relevant to the claimant's condition during the time period for which benefits were denied," probative, and presents a reasonable possibility that the additional evidence would have resulted in a different determination by the Commissioner; and (3) was not presented earlier due to good cause. *Lisa v. Sec'y of the Dep't of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).

### III. DISCUSSION

#### A. The Disability Determination

A claimant is entitled to disability benefits under the SSA if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

Here, in reaching his conclusions that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefits. (AR 15-21.) First, the ALJ determined that plaintiff was not engaged in substantial gainful activity from April 2, 1992, the alleged onset date, and December 31, 1997, when plaintiff was no longer insured. (*Id.* 17.) Second, the ALJ determined plaintiff suffered from a severe impairment, specifically chondromalacia patella of the right knee. (*Id.* 17-18.) The ALJ also determined that, although "[i]t is probable that the claimant's multiple sclerosis is currently disabling…there is no evidence whatsoever of limitations due to this condition while the claimant was insured." (*Id.* 18.) The ALJ also indicated that plaintiff was unwilling to take, and did not take, any medications for the MS through at least December 31, 1997. (*Id.*) Third, the ALJ determined that plaintiff did not have an impairment or combination of impairments that "met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526)." (*Id.*) The ALJ noted that, although plaintiff had joint dysfunction, she "failed to meet the burden of proof in establishing that the criteria of a listed impairment are met or equaled." (*Id.*) Fourth, the ALJ determined that plaintiff was "'disabled' from her job as a police officer." (*Id.* 19-20.) Fifth, the ALJ determined, after undergoing a two-step analysis, that plaintiff "was able to perform alternative substantial gainful activity at a lesser exertional level." (*Id.*)

## B.  Plaintiff's Cross-Motion

Plaintiff opposes defendant's motion and cross-moves for judgment on the pleadings, alleging that (1) the Administrative Law Judge ("ALJ") committed reversible error in failing to obtain the advice of a medical expert to assist in determining plaintiff's disability onset date, (2) the ALJ failed to set forth the requisite "good cause" for rejecting a treating physician's opinion, (3) the ALJ failed to properly discuss 20 C.F.R. § 404.1529 factors, and (4) the ALJ did not meet the burden of showing that there was other work in the national economy that plaintiff could perform.  Plaintiff, in the alternative, seeks a remand on these issues. For the reasons that follow, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. In particular, the Court concludes that additional development of the record is necessary, including clarification from the treating physician regarding his opinion of the disability onset date and the basis for that determination.

### 1.  "Good Cause" to Disregard Treating Physician's Opinion

The Court first addresses plaintiff's argument regarding the ALJ's disregard of Dr. Varriale's opinion.  Plaintiff argues that the ALJ failed to apply the "treating physician rule" to the medical opinion of Dr. Varriale by not giving his retrospective opinion "controlling weight."  (Pl.'s Br. at 14-19.) Plaintiff also argues that, to the extent the record was unclear or incomplete with respect to Dr. Varriale's opinion, the ALJ had a duty to contact Dr. Varriale to clarify his opinion.  For the reasons set forth below, the Court remands this case with instructions that the ALJ seek clarification from Dr. Varriale regarding his opinion that plaintiff is disabled due to her knee impairment.

a.  Treating Physician Rule

The Commissioner must give special evidentiary weight to the opinion of the treating physician.  *See Clark*, 143 F.3d at 118.  The "treating physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence."  *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).  The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The Second Circuit has explained, "[a] treating physician's statement that the claimant is disabled cannot be itself determinative."  *Roma v. Astrue*, No. 10-4351-cv, 2012 WL 147899, at *1 (2d Cir. Jan. 19, 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  "It is the Commissioner who is 'responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability.'"  *Id.* (quoting 20 C.F.R. § 404.1527(e)(1)).

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion.  *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118.  These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors.  20 C.F.R. § 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118.  When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion."  *Clark*, 143 F.3d at 118 (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07-cv-958(DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is

inherently more familiar with a claimant's medical condition than are other sources." (internal quotation marks omitted)). A failure by the Commissioner to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

"Furthermore, the ALJ has the duty to 'recontact' a treating physician for clarification if the treating physician's opinion is unclear." *Ellett v. Comm. of Soc. Sec.*, No. 1:06-CV-1079 (FJS), 2011 WL 1204921, at *7 (N.D.N.Y. Mar. 29, 2011); *see also Mitchell v. Astrue*, No. 07 Civ. 285(JSR), 2009 WL 3096717, (S.D.N.Y. Sept. 28, 2009) ("If the opinion of a treating physician is not adequate, the ALJ must 'recontact' the treating physician for clarification." (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)). Such an obligation is linked to the ALJ's affirmative duty to develop the record. [1] *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).

### b. Application

The Court finds that Dr. Varriale's 2006 opinion that plaintiff was disabled is unclear. It is evident that the ALJ also found Dr. Varriale's opinion to be unclear, as the ALJ noted that "[n]o specific functional limitations were set forth by Dr. Varriale, nor did he state the timeframe of the alleged disability." (AR 19.) The record evidence regarding plaintiff's knee injury was, by the ALJ's own analysis, "very limited." (*Id.*) As

Dr. Varriale treated plaintiff for her knee impairment during the relevant time period, clarification would assist the ALJ in making the disability determination with respect to plaintiff's knee impairment. *See Papadopoulos v. Astrue*, No. 10 Civ. 7980(RWS), 2011 WL 5244942, at *8 (S.D.N.Y. Nov. 2, 2011) ("Because 'further findings' would so plainly help to assure the proper disposition of [plaintiff's] claim, remand is appropriate in this case." (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)). No other doctor treated plaintiff exclusively for her knee impairment during the relevant time period. In light of the ALJ's affirmative duty to develop the record, the limited medical evidence regarding plaintiff's knee impairment, and the unclear nature of Dr. Varriale's opinion regarding the onset date of the knee disability, the ALJ had a duty to recontact Dr. Varriale for clarification. After remand, the ALJ is directed to contact Dr. Varriale for clarification of his 2006 opinion, and to the extent necessary, obtain additional information regarding plaintiff's knee impairment.

### 2. Advice of a Medical Expert

Plaintiff also argues that the ALJ erred by failing to obtain the advice of a medical expert to assist in determining plaintiff's disability onset date. With respect to this argument, plaintiff requests remand with instructions to obtain medical expert testimony. (Pl.'s Br. at 14.) As the Court has determined that the case must be remanded for clarification of Dr. Varriale's opinion, the Court finds that, to the extent necessary after the clarification of Dr. Varriale's opinion, the ALJ should utilize a medical expert to determine the onset date of plaintiff's disability.

---

[1] It is well-established that the ALJ must "'[a]ffirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). The ALJ's regulatory obligation to develop the administrative record exists even when the claimant is represented by counsel or by a paralegal at the hearing. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

a.  Duty to Obtain a Medical Expert
Pursuant to SSR 83-20

SSR 83-20: Titles II and XVI: Onset of Disability "state[s] the policy and describe[s] the relevant evidence to be considered when establishing the onset date of disability under the provisions of titles II and XVI of the Social Security Act . . . and implementing regulations." SSR 83-20, *found at* 1983 WL 31249, at *1 (S.S.A. 1983). "SSR 83-20, which is binding on the Commissioner, applies to cases that require the ALJ to determine when the claimant first became disabled." *Caputo v. Astrue*, No. 07-CV-3995 (DLI)(JO), 2010 WL 3924676, at *3 (E.D.N.Y. Sept. 29, 2010).

SR 83-20 states,

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. The judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

SSR 83-20, *found at* 1983 WL 31249, at *3 (S.S.A. 1983).

SSR 83-20 "imposes what might fairly be called heightened record-development duties." *Plumley v. Astrue*, No. 2:09-CV-42, 2010 WL 520271, at *8 (D. Vt. Feb. 9, 2010) (quoting *Godsey v. Astrue*, No. 08-410-P-S, 2009 WL 1873528, at *3 (D. Me. June 29, 2009); *see also Caputo v. Astrue*, No. 07-CV-3992 (DLI)(JO), 2010 WL 3924676, at *3 (E.D.N.Y. Sept. 29, 2010). It "provides that when a claimant's medical or work evidence is not consistent with the claimant's alleged disability onset date, the ALJ may need to further develop the record to reconcile the discrepancy." *Plumley*, 2010 WL 520271, at *8. SSR 83-20 "does not mandate that a medical advisor be called in every case, [but] courts have construed this step to be 'essential' when the record is ambiguous regarding onset date." *Id.* (citing *Kelly v. Astrue*, No. 06-168-P-S, 2007 WL 2021923, at *7 (D. Me. Jul. 11, 2007)).

b.  Application

There is substantial evidence, in the record and in the ALJ's decision, indicating that plaintiff was disabled at the time of the ALJ's decision. In his decision, the ALJ stated "[i]t is probable that the claimant's multiple sclerosis is currently disabling, but this is not relevant in the present matter because there is no evidence whatsoever of limitations due to this condition while the claimant was insured." (AR 18.) The Court reads the ALJ's decision to state that plaintiff's knee impairment did not render her unable to perform sedentary work through 1997, but at some point after 1997, plaintiff's MS rendered her unable to perform any work in the national economy.

On remand, to the extent the ALJ finds that the plaintiff is currently disabled, at least in part because of her knee impairment, the ALJ should utilize an expert to

determine the onset date of her disability.[2] Given the "limited" medical evidence regarding plaintiff's knee impairment, a medical expert will allow the ALJ to fully develop the record in order to arrive at an accurate determination of plaintiff's status between 1992 and 1997.

### 3.  Plaintiff's Additional Arguments

Plaintiff also argues that the ALJ committed reversible error in failing to discuss the factors set forth in 20 C.F.R. § 404.1529 and focusing solely on the objective medical evidence, and in failing to consider additional nonexertional impairments when he determined that plaintiff could perform sedentary work in the national economy.   In light of the Court's decision to remand the case with the instructions to clarify Dr. Varriale's opinion, and utilize a medical expert to the extent necessary, the Court does not address these arguments because the ALJ shall re-assess the evidence in the record in light of the new evidence.  The ALJ will obviously evaluate plaintiff's symptoms in accordance with 20 C.F.R. § 404.1529 and the significance of plaintiff's nonexertional impairments.

### IV.  CONCLUSION

For the reasons set forth above, the cross-motions for judgment on the pleadings are denied, but the plaintiff's motion for remand is granted.  The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Specifically, on remand, the ALJ must contact Dr. Varriale for clarification of his 2006 opinion, and to the extent necessary, obtain additional information regarding

plaintiff's knee impairment.  In addition, to the extent the ALJ finds that the plaintiff is currently disabled, at least in part because of her knee impairment, the ALJ should utilize an expert to determine the onset date of her disability. The ALJ should then evaluate this new evidence in light of the entire record, including consideration of the factors set forth in 20 C.F.R. § 404.1529 and the significance of plaintiff's nonexertional impairments.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  March 29, 2012
        Central Islip, New York

*     *     *

The attorney for plaintiff is Louis R. Burko, Severance, Burko, Spalter & Masone P.C., Montague Center, 189 Montague Street, Brooklyn, NY 11201.   The attorney for defendant is:  Loretta E. Lynch, United States Attorney, by Robert W. Schumacher, II, Assistant United States Attorney, United States Attorney's Office, 610 Federal Plaza, Central Islip, NY 11722.

---

[2] In connection with the onset date of the plaintiff's disability, the expert and the ALJ shall determine whether any effects from plaintiff's MS contributed to any disability during the relevant time period, including plaintiff's nonexertional impairments.